Filed 2/5/16  P. v. Rosas CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D068483 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FWV1102700) |
| ISABEL ROSAS et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of San Bernardino County, Shahla S. Sabet, Judge.  Both judgments affirmed in part and reversed in part.

Mark L. Christiansen, under appointment by the Court of Appeal, for Defendant and Appellant Isabel Rosas.

David McNeil Morse, under appointment by the Court of Appeal, for Defendant and Appellant Rogelio Varela.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Randall D. Einhorn and Lise S. Jacobson, Deputy Attorneys General, for Plaintiff and Respondent.

Following a joint trial before separate juries in San Bernardino County, Isabel Rosas and Rogelio Varela (together the defendants) were both found guilty of three felonies: (1) first degree felony murder in connection with the kidnapping and killing of Rosas's lover, Erick Estuardo Cate Otzoy (Cate) (count 1: Pen. Code,[1] 187, subd. (a)); (2) kidnapping of Cate (count 2: § 207, subd. (a)); and (3) assault upon Cate by means of force likely to produce great bodily injury (count 3: § 245, subd. (a)(4)). Varela's jury found to be true allegations that he personally inflicted great bodily injury upon Cate during the commission of the kidnapping and assault within the meaning of section 12022.7, subdivision (a) (hereafter section 12022.7(a)).

The court sentenced each of the defendants to an indeterminate state prison term of 25 years to life for their count 1 felony murder convictions, plus determinate terms of eight years for their count 2 kidnapping convictions and one year for their count 3 assault convictions. The court also sentenced Varela to a consecutive three-year term for each of his count 2 and count 3 great bodily injury enhancements (§ 12022.7(a)). Thus, the court sentenced Rosas to a total determinate prison term of nine years followed by an indeterminate term of 25 years to life, and it sentenced Varela to a total determinate term of 15 years followed by an indeterminate term of 25 years to life.

Both defendants appeal. Rosas contends her convictions of all three counts must be reversed because her fourth statement to law enforcement (discussed, *post*), in which she first admitted her involvement in Cate's kidnapping, should have been excluded

---

[1]     All further statutory references are to the Penal Code.

because the police failed to advise her of her *Miranda*[2] rights before she made her self-incriminating statements.  Relying on her own statements to the police that she told Varela and others not to hurt Cate, Rosas also contends her conviction of assault by means of force likely to produce great bodily injury must be reversed because there is no evidence she intended to aid and abet the assault upon Cate.

In addition, defendants contend (1) the sentence imposed for their kidnapping convictions should be stayed under section 654 because the prosecution's theory of first degree murder was felony murder based on the predicate felony of kidnapping, and (2) the sentences imposed for their convictions of assault by means of force likely to produce great bodily injury should be stayed under section 654 because the assault was an element of the kidnapping, and, thus, the assault and kidnapping were part of an indivisible course of conduct.  The Attorney General agrees the sentences imposed for defendants' kidnapping convictions should be stayed under section 654.

We modify the judgments to stay under section 654 the execution of the sentences imposed for Rosas's and Varela's count 2 kidnapping convictions.  We affirm the judgments as modified and remand the matter to the superior court with directions to correct the abstracts of judgment.

---

[2]     *Miranda v. Arizona* (1966) 384 U.S. 436.

FACTUAL BACKGROUND

A. *The People's Case*

In mid-September 2011, Varela offered to pay his friend, Oscar Zuniga,[3] to drive a car that belonged to one of Varela's female friends. Oscar believed Varela planned to steal the car.

On October 4, 2011, Varela called Oscar and asked him whether he and his brothers, David[4] and Pizana, could pick him up. Tafich and Garcia were with Oscar at this time. Oscar, his brothers, Tafich, and Garcia picked Varela up in San Bernardino in Pizana's black Ford Expedition. Varela indicated that the woman they were going to pick up in Pomona would buy gas for them. Varela told the other men not to talk to the woman and to make sure she did not know who they were.

The men traveled to Rosas's house in Pomona and she got into the Expedition. Around 8:39 p.m., Rosas used her credit card to purchase $50 worth of gas at a gas station in Pomona.

---

[3]     The prosecution jointly charged Rosas, Varela, Oscar Zuniga, David Zuniga, Jose Pizana, Daniel Garcia, and Yussef Tafich with murder, kidnapping and assault with a deadly weapon. ·Because they share the same last name, we refer to Oscar Zuniga and David Zuniga by their first names. Before Rosas and Varela's trial, Oscar pleaded guilty to voluntary manslaughter, kidnapping, and assault causing great bodily injury. In exchange for his truthful testimony against his codefendants, Oscar received a 22-year prison sentence for these offenses. David and Garcia, who were both 17 years old at the time of the crimes, pleaded guilty to assault by means of force likely to produce great bodily injury and false imprisonment. In exchange for their truthful testimony against their codefendants, the prosecutor agreed David and Garcia would receive a maximum of three years in prison. Tafich and Pizana did not testify at Rosas and Varela's trial.

[4]     See footnote 3, *ante*.

4

Varela, who had been whispering to Rosas, directed Pizana, who was driving, to drive them to the parking lot of the Legends Burgers (Legends) where Cate worked. Varela and Rosas got out of the Expedition, sat down on benches, and spoke to each other for about 20 to 30 minutes.

Varela returned to the Expedition, he and the other men drove to a liquor store where Varela purchased some things, and then they drove to Montclair Plaza. Varela told the men they would have to wait there until Rosas called or texted them to return to Legends. Varela told them Rosas was going to tell Cate to give her the Buick and that if he did not do so, Varela and and the other men would take the car by force. Varela also said Rosas wanted them to beat up Cate, take him to Tijuana, and leave him there so he could not come back because he did not have any "papers."

At around 12:31 a.m. on October 5, 2011, Rosas contacted Varela by phone.[5] Varela then told the men, "It's time. Let's go," and the group returned to Legends in the Expedition. Cate's Buick had been moved to another space in the parking lot. All of the men got out of the Expedition and approached Cate's Buick except for Oscar, who stayed in the Expedition. Pizana opened a back passenger seat door of the Buick and Rosas got out. Pizana entered the backseat and repeatedly punched Cate in the back. Varela, Tafich, Garcia and David then joined Pizana in punching Cate. Cate was wearing underwear but no pants. When someone broke one of the windows of the Buick, Garcia

---

[5]     Both juries heard testimony from a Sprint custodian of records regarding defendants' cell phone calls between October 1 and 5, some of which corroborated the specific testimony of their codefendants.

and David became scared and ran back to the Expedition.  Rosas remained outside the Buick during the assault, standing by the open passenger door and watching what was going on inside the car as it rocked back and forth.  She said nothing and did not try to run away.

Eventually, Rosas got into the front passenger seat of the Buick and drove with Varela, Pizana, Tafich and Cate to a warehouse 10 to 15 minutes away.  Oscar followed them in the Expedition and then got into the driver's seat of the Buick after it was parked.  Pizana and Tafich got back into the Expedition with David and Garcia.  Varela, who was seated in the back seat of the Buick behind Oscar Varela leaned forward and whispered to Rosas, who was seated in the front passenger seat, before he gave Oscar directions.

At around 1:47 a.m. on October 5, Rosas used her credit card to buy gas for the Buick at a gas station in Murrieta.  While Oscar was putting gas in the Buick, he saw Varela sitting on the back seat and Cate lying on the floorboard with what appeared to be a bloodstained towel over his head.  When Oscar moved toward the gas pump, he noticed the Buick was moving again, as if a struggle was going on inside.  Oscar looked inside the rear window of the Buick and saw Varela "on all fours" like he was struggling to hold something down while the Buick was moving back and forth.  Oscar testified he could hear someone "trying to scream with something over his face."  The screaming was not coming from Varela's mouth.

Varela told Oscar to drive him and Cate to a dark spot because the lights in the gas station were shining inside the car.  Oscar did so and then exited the Buick while Varela remained inside the car with Cate.  Oscar heard someone trying to scream for a few

6

minutes. After the screaming stopped, Varela told Oscar to get back in the car and drive to the gas station, and Oscar reluctantly did so.

The men picked Rosas up at the gas station and drove south on Interstate 15 to a location in San Diego where Varela took over as the driver and Oscar got in the backseat with Cate on the floorboard next to him. Varela asked Rosas, "Where do we go?" Rosas replied, "I don't know." Varela eventually pulled over by a brushy area and told Oscar to help him drag Cate out of the car. Varela gave Oscar some magazine pages to put on his hands to help drag Cate. Rosas remained in the Buick.

Varela and Oscar dragged Cate behind a bush. Cate was not moving and did not appear to be breathing. Oscar and Varela returned to the car. Oscar testified that Rosas, who was still in the car, was wearing light-colored latex gloves and looking through the glove compartment. Oscar drove Rosas and Varela back to San Bernardino. During the drive, Rosas gave Varela a cell phone and told him to call their pastor and tell him that Cate was leaving for Florida with his ex-girlfriend. Varela used a blocking feature on his phone and left a voice mail message with the pastor around 2:13 a.m. that same morning (October 5).

During the drive, Valera and Rosas bickered about what to do with Cate's Buick. Valera told Rosas he had already done too much and she had to get rid of the car. Rosas said Valera had not finished everything that she had paid him for. They discussed burning or crushing the Buick because of the bloodstains inside the car. When Oscar reached a point near his home, he parked and told Varela he was getting out. Two or three days later, Tafich paid Oscar $100.

7

In the evening on October 5, Cate's girlfriend, Monica Sanchez, went to the church that she, Cate and Rosas regularly attended. Sanchez saw Rosas there that night and told her Cate had not come home the previous night. Sanchez was unaware of Cate's relationship with Rosas. Rosas told Sanchez she had not seen or heard from Cate.[6] Sanchez spoke to the pastor about Cate's disappearance, and the pastor played Varela's phone message for her.

The next day, October 6, Sanchez reported Cate's disappearance to the police. At around 7:00 p.m. that night, authorities found Cate's Buick on fire on a dead-end street in an unincorporated area of Muscoy. All of the fabric on the back seat of the car was destroyed except for a bloodstained area underneath a piece of wood and newspaper.

Rosas's jury heard testimony that, after a church service on October 8, the pastor told Rosas that they could not find Cate. Rosas appeared to be a little surprised by the news.

Both juries heard that several days later, on October 12, 2011, Rosas reported to the police that she had been kidnapped while she was with Cate in a white car. Rosas's jury heard translations of the statements she made to the police during her interviews on October 12, 13, 17 and 18. The jury also viewed portions of the video recordings of the interviews.

During her third interview on October 17, in response to questioning by Detective Maurice Duran of the Upland Police Department, Rosas repeatedly maintained she was

---

6    Only Rosas's jury heard Rosas's statement.

kidnapped, but she admitted she put gas in the Expedition and the Buick the night she was allegedly kidnapped (October 5). She stated that Varela told her to do it. Rosas identified Varela, a former coworker, as one of the kidnappers and the person who likely called the pastor. She said Varela and the other men demanded money and then beat Cate. Rosas told Detective Duran that she heard Cate screaming when they stopped to put gas in the Buick. She also stated that the men drove Cate to another street and, when they returned, Cate was no longer screaming. They then drove to a field in San Diego or Escondido and left Cate there. Rosas also stated the men dropped her off after they drove back. When the third interview ended, Rosas accompanied the police to San Diego to search for Cate. They did not find him.

The fourth interview began late that same night (October 17) when Rosas and the detectives returned from San Diego, and it continued into the early morning hours of October 18. At around midnight, early in the interview, Rosas admitted to Detective Duran that she was not a kidnapping victim. She said the plan was for her and Varela to take Cate to Tijuana and leave him there so that Cate would have to pay someone to return to the United States. Rosas agreed to pay Varela $500 or $600 to help her. Rosas told Detective Duran she was mad at Cate and was going to take him to Tijuana because he was always asking her for money, he already owed her a lot of money, and he had lied to her about his relationship with Sanchez. Throughout the interview Rosas maintained that she did not intend for Varela and his cohorts to hurt Cate and that she told Varela not to hurt Cate.

9

Rosas also told Detective Duran during the interview that both Oscar and Varela beat Cate in Murrieta and that Cate's face did not appear to be hurt at that time or when they left him in San Diego. Rosas admitted it was her idea to call the pastor on the way back to San Bernardino. She also admitted that she paid Varela $500 after the kidnapping. Rosas stated she asked Varela the next day whether Cate was alive when they pulled him out of the car in San Diego, and Varela replied he did not know because he did not check Cate's pulse.

Detective James Potts interviewed Varela later that day (October 18). A video recording of the interview was admitted into evidence and played only for Varela's jury. After Varela waived his *Miranda* rights, he told Detective Potts that Rosas was a former coworker and that he met Cate through Rosas. Varela stated he had not heard that Cate and Rosas had been kidnapped. When Detective Potts told Varela they had interviewed Rosas several times and she was blaming him "for some things," Varela claimed he "was just a tool," Rosas said Cate owed her money, and Rosas "was the one that set the whole thing up." Varela indicated that Rosas had paid for Cate's dental work and that Rosas wanted Cate to bring back a white Buick she had helped pay for. Varela told Detective Potts that Rosas asked him for help and offered to pay him. Rosas wanted him to tie Cate up, break his legs and take him to Tijuana so that Cate, who was not a citizen, could see how expensive it would be to return to the United States. Varela stated he agreed to help and recruited his friends, Pizana, Oscar, Tafich, and two of their friends, Garcia and Zuniga, to help. Varela stated he told them they needed to "kick [Cate's] ass" and drive him to Tijuana and leave him there.

10

Varela also told Detective Potts that Rosas provided the men with pieces of green rope to tie up Cate and that he and Rosas went over the plan in the Legends parking lot. Rosas told him she would park the Buick in the darkest place in the parking lot, and Varela and the other men were to approach Cate, "take him down," and tie him up. Varela also said Rosas had "staged" the crimes so she would look like a kidnapping victim. When Varela got in the back seat with Pizana and Cate, he told Cate in accordance with Rosas's instructions that Sanchez's father had sent him and that he (Cate) was to stay away from Sanchez. Varela told Detective Potts that Cate was screaming loudly during the ride to Monte Vista and that Pizana and the others hit Cate. When they stopped for gas on the way to San Diego, Cate was screaming and bleeding from his nose and mouth. Varela said he stuffed a blanket in Cate's mouth, drove across the street, told Cate to be quiet, and Cate complied.

Varela told Detective Potts that when they stopped in San Diego, Rosas put on some blue latex gloves and shoved vodka from two pint-sized bottles into Cate's mouth. Varela indicated that Rosas had instructed him to buy the vodka. Varela thought Cate was unconscious at this time. Rosas then instructed him to untie Cate's arms and legs, remove his shirt, and take his belt. Varela stated he ripped off Cate's shirt, untied his arms but not his legs, and left the belt by Cate's body. Varela indicated that Rosas directed him to pour vodka on Cate to remove any evidence and that he complied. Varela, Rosas, and Oscar then returned to San Bernardino and went their own ways. During the drive, Rosas persuaded him to call Cate's pastor.

11

Varela also told Detective Potts that Tafich called him the next day and said he was putting them at risk because their fingerprints were on the Buick. Varela said he told Tafich they left the Buick with the keys in it by an abandoned storage business. Tafich told him not to worry about the car. Varela said Rosas paid him $300, and he had to split the money with the other men.

Varela told the police that Rosas told him to beat up Cate another time and that he had tried to do so. They realized then that they would need more people. Varela agreed to accompany the police to the location where they left Cate's body.

Both juries heard testimony that on October 18 Varela led the police to a canyon by Fairmount Avenue near Interstate 8 in San Diego, where they found Cate's decomposing body. Cate was wearing a white tank top undershirt, blue boxer underwear, a white sock, and black pants that were around his ankles. His ankles were bound with a green nylon rope. The police found a red plastic bottle cap by Cate's hip area, a second red bottle cap under his head, and two pieces of paper from a Spanish-language religious pamphlet, one under his left shoulder area and the other around his right lower leg.

An autopsy established that Cate died of "homicidal violence with head and neck trauma." Cate's injuries included six lacerations on his scalp and a fractured thyroid cartilage. The injuries were consistent with blunt trauma. Cate also had a large hole in the back of his head and neck and additional smaller holes near his ankles. The holes could have been caused by animals or foul play.

On October 26 the police searched Varela's car and found multiple pairs of blue gloves and a green rope underneath the front seat. The green rope had the same texture and color and texture as the rope found on Cate's feet.

B. *The Defense Cases*

Neither Rosas nor Varela presented any evidence. During closing arguments, Varela's counsel argued that the testimony of the coparticipants was not credible because of their agreements with the prosecution. Rosas's counsel argued she was not guilty of the charges and that it was Varela's plan to enlist the other males, to assault Cate, and to take him to Mexico by force.

DISCUSSION

I. *ROSAS'S MIRANDA CLAIM*

Rosas contends her convictions of all three counts must be reversed because the evidence of her statements during her *fourth* interview by law enforcement late at night on October 17-18, 2011, admitting her involvement in Cate's kidnapping, should have been excluded because the police failed to advise her of her *Miranda* rights before she made her self-incriminating statements. We reject this contention.

A. *Background*

1. *Rosas's motion to suppress*

Prior to trial, Rosas's counsel moved to suppress Rosas's statements to the police on the ground they were obtained in violation of *Miranda* and were involuntary. Detectives Duran and Potts testified at the hearing on Rosas's motion.

13

Detective Duran, whose first language is Spanish, testified he first met with Rosas on October 12, 2011, at the Montclair Police Department. Rosas reported to the police that she and her friend Cate had been kidnapped and she had no idea what had happened to him. After he determined that Cate had not shown up for work, Detective Duran asked Rosas whether she would be willing to accompany him to the Upland Police Department, and Rosas agreed to do so. Detective Duran then drove her there. Rosas was not handcuffed or advised of her *Miranda* rights at any time during the interview, and she was free to leave at any time. Detective Duran spoke to her in Spanish during the entirety of this first of four recorded interviews.

On October 13, 2011, the date of the second interview, Detective Duran picked Rosas up at her home and drove her to the Upland Police Department where Detective Potts interviewed her in an interview room with Detective Duran acting as the translator. The detectives went over the statements Rosas gave the previous day. Detective Duran testified he still believed during this entire interview that Rosas was a kidnapping victim, and he took pictures of her because of this. Rosas was not advised of her *Miranda* rights during the 59-minute interview. She was not handcuffed, the door was not locked, and she was free to leave at any time.

Detective Duran testified that after the second interview, he went to Cate's church and spoke with the pastor. The pastor played Varela's phone message for him. The police also spoke to Sanchez and one of Cate's coworkers, and they obtained glass from the Legends parking lot and video recordings of the lot.

14

The third interview started at 10:40 a.m. the following Monday, October 17, and lasted three hours 46 minutes. Detective Potts conducted the interview in the interview room at the Upland Police Department, and Detective Duran translated. Detective Duran testified that during the interview they tried to clarify some inconsistencies in Rosas's story. Detective Duran knew Rosas was involved, but he did not know whether she was a suspect or a victim because he did not know how she was involved. Detective Duran testified that his main concern at that point was finding Cate, and he did not *Mirandize* Rosas because he was "[s]till trying to figure out what her relationship [was] to this case." The interview room door was unlocked during the third interview and Rosas was not handcuffed. Rosas was free to leave during the interview, although she was not told this. The police gave her breaks and offered her water. Rosas agreed during the interview to accompany the detectives to San Diego to help them find Cate.

Detective Duran further testified that he and Detective Potts drove with Rosas in one car, and two officers followed in a second car. Rosas told the officers she was not sure which way they drove on the night of the kidnapping because she did not know the area. She voluntarily gave the detective her credit card and said, "You can check the card because that will tell you which way we went." The police determined the card had been used in Murrieta. The officers stopped at that gas station with Rosas on the way to San Diego and purchased food and a drink for Rosas there. They also stopped so that Rosas could go to the bathroom. Detective Duran testified that Rosas used her cell phone during the drive to San Diego, and the police did not confiscate her cell phone at any point. They drove around San Diego for a couple of hours with Rosas and then drove

15

back to Upland. Rosas never said she wanted to get out of the car in San Diego, and she was free to leave. They did not talk much during the early part of the drive, but when they reached the Escondido area, Rosas spontaneously started talking about her relationship with Cate. She said she felt Cate had taken advantage of her, she had bought him a car and she had given him money for a computer.

At around 11:30 p.m. that same day (October 17, 2011), after Rosas and the detectives arrived back at the Upland police station, Detective Duran conducted the fourth and final interview and talked to Rosas by himself for about an hour in the interview room. The interview continued into the early morning on October 18. Detective Duran testified he was trying to eliminate the inconsistencies in Rosas's story and get to the truth. Rosas discussed her relationship with Cate and told Detective Duran she felt Cate was abusing her financially, sexually and emotionally. She said she had complained to Varela about this and told Varela she planned to take Cate to Tijuana and leave him there so that Cate would have to pay to get across the border. Detective Duran testified this was the first time Rosas had indicated she was involved in Cate's kidnapping. Soon thereafter at around 12:35 a.m. on October 18, Detective Potts instructed Detective Duran to *Mirandize* Rosas, and Detective Duran did so.

Detective Potts, the lead investigator, testified he was brought into the case on October 13, 2011. After he learned Cate's car had been stripped, burned and recovered in San Bernardino, he asked Detective Duran to pick Rosas up and bring her to the Upland Police Department that day. Detective Potts then interviewed Rosas in an interview room at the police department. Detective Duran, who was with Detective Potts during this

16

second interview, translated Detective Potts's questions and asked questions on his own. Detective Potts testified they were trying to locate Cate and wanted to clarify Rosas's earlier statements and see if she could remember any additional details. Detective Potts did not tell Rosas she was free to leave during the interview because he believed she was a victim and he does not tell victims they are free to leave. Detective Potts testified Rosas appeared to be sincere and she was "[v]ery cooperative." Following the standard practice with victims, Detective Potts directed that pictures be taken of Rosas.

Detective Potts testified that on the date of the third interview (October 17), he and another detective drove to Rosas's house in Pomona and asked her whether she would be willing to return to the Upland police station and talk to them. Rosas gathered her things "within a minute" and willingly accompanied them to the police station. Detective Potts wanted to talk to Rosas because the phone log for Varela's phone, which contained the pastor's number, also contained Rosas's phone number. Detective Potts still believed Rosas was a victim, but he thought there was a possibility that Rosas knew who the suspects were and was afraid to tell the officers who they were.

The third interview took place in the interview room at the Upland Police Department. Once again, the interview room door was not locked and Detective Duran assisted with translation. Detective Potts testified he asked most of the questions at the beginning of the interview. He wanted to find out why Rosas had called Varela. During the interview, Rosas said she used to work with Varela. She told Detective Potts she bought gas for the kidnappers' car with her credit card on the night of her kidnapping. Detective Potts testified that although these circumstances were unusual, he still did not

17

consider Rosas a suspect because victims in past investigations had given suspects money or put gas in their cars. Detective Potts believed the inconsistencies in Rosas's stories were the result of her fear and that she was afraid to say what happened because she knew at least one of the people involved. Detective Potts testified that Rosas was given breaks before they went to San Diego, she was offered something to drink and eat, and she used the bathroom at the station.

Detective Potts testified that when he, Rosas, and Detective Duran drove to San Diego, he had the other officers follow them because, if they located Cate or his body, they would need someone to drive Rosas back to the station. He also testified that Rosas did not go home when they returned to the station that night because they had asked her if they could ask her some more questions, and "[s]he said she [was] willing to stay and talk to [them]. She had made a phone call to her daughter letting her know she was going to be late." Detective Potts stated they "allowed [Rosas] to keep her phone with her as we do with all victims," and he had asked Rosas several times before this if she needed to call her family and let them know where she was. Detective Potts testified he still believed Rosas was a victim, and his goal at that point was still to find Cate.

Detective Potts further testified he left Detective Duran alone in the interview room with Rosas during the beginning of the fourth interview because he felt that she might feel more "comfortable with somebody Spanish-speaking, of the same heritage, per se." Detective Potts was not present when Rosas made the statement about being involved in the kidnapping. When Detective Duran told him about it, Detective Potts

18

instructed him to *Mirandize* Rosas in Spanish because Detective Potts knew she was involved and not a victim.

In addition to the testimony of Detectives Duran and Potts, the court considered—at the request of Rosas's counsel—the video recordings and the transcripts of the translations of Rosas's interviews. The court questioned Detective Duran's characterization of his role as a mere translator and commented that this affected the credibility of his testimony. The court noted that the questioning on inconsistencies in Rosas's statements started during the second interview and stated that the tone of questioning during the third interview became "progressively more aggressive, confrontational." The court also noted there were threats to arrest Rosas if she was lying and accusations that she was involved in the case, lying or changing her story.

The court then focused on Rosas and stated that "the circumstances [were] that this [was] not a witness off the street that they brought in to question," and Rosas was "not even . . . a person of interest"; she was "a victim that ha[d] voluntarily come to them and [kept] coming back." The court found that Rosas appeared to be a victim "in the eyes of the officers," and she would so appear to "any reasonable person."

The court also found that "[a]ny reasonable person under the circumstances" would see Rosas as an "innocent looking, middle aged, recently widowed woman with five children who claims she's been kidnapped." The court described Rosas as "the master of cunning and calculation. . . . Every time they tried to catch her in her inconsistencies and lies, she turn[ed] it around and use[d] it in supporting her theory or her story of being a victim. And I can give you numerous examples. See how many

19

pages I have tagged. She basically runs with any suggestion with the officers." As an example, the court stated that Rosas "said she hasn't been threatened. She has come [to the police station] voluntarily. The minute they ask her . . . very early on, 'Did somebody threaten you?[,'] she runs with that and at the third interview she says, 'They told me to keep my mouth shut.' That's why she doesn't divulge. She doesn't tell the truth. She doesn't tell the whole truth."

The court observed that every time it believed the officers had "hit the line" where *Miranda* advisals were necessary, Rosas "[gave] them more ammunition to treat her as a victim, as [someone who] still deserve[d] to be given another chance to explain herself."

The court found that, "[w]hen you look at the totality of circumstances, the officers did not cross the line of not advising her of her rights, because at all times she was still maintaining and she fed into the story that she was a victim of a crime." The court noted that when Rosas finally made an inculpatory statement by saying she did not intend to harm Cate, the officers advised her of her *Miranda* rights. The court acknowledged that before Rosas's inculpatory statement, the officers told her once in an angry tone and once in a gentle tone that it was her time and her choice whether she would be treated as a suspect or a witness. However, the court observed that even with those questions, the officers never said or believed that Rosas was a suspect.

The court then ruled that "the special circumstances that [Rosas] brought with her, her ability to manipulate and change and still take the position of a victim, her personal characteristics, which reaffirmed what she was saying, [are] sufficient for me to find that there was no violation of *Miranda* advisement."

20

The court also ruled that Rosas's statements were voluntary. The court specifically found that Rosas "was under no duress except constant barrage of facing her with her inconsistencies and asking [her] to tell the truth."

Rosas's counsel argued that when Detective Potts sent Detective Duran to pick her up, "a reasonable person could look at that as a demarcation point between voluntariness and involuntariness." Counsel asserted Rosas was not treated like a victim. Counsel also asserted that while the police provided basic "accoutrements of voluntariness," they never told her she was free to leave, the officers knew she was lying and was involved, and Rosas was in fact a suspect.

The court responded that in between the second and third interviews the officers invited Rosas to call or contact them if she had any questions. The court found that although the police did not call Rosas before they picked her up, this was not a demarcation point where Rosas became a suspect.

Following further discussion, the court stated, "[M]y ruling will stand that I do not find under the circumstances of this case . . . any violation of *Miranda* advisement. [Rosas] was treated as a potential witness that may have had some involvement, unknown involvement, but still a victim of a kidnapping." The court added, "I also don't see any issues regarding voluntariness of her participation." The court denied Rosas's motion to suppress, stating her statements would "come in over [her] objection."

21

B. *Applicable Legal Principles*

1. *Miranda rule and the objective custody test*

"To protect the Fifth Amendment privilege against self-incrimination, a person undergoing a *custodial* interrogation must first be advised of his right to remain silent, to the presence of counsel, and to appointed counsel, if indigent." (*People v. Stitely* (2005) 35 Cal.4th 514, 535, italics added, citing *Miranda*, *supra*, 384 U.S. at pp. 444, 467-473, 478-479.) "As long as the suspect knowingly and intelligently waives these rights, the police are free to interrogate him." (*Stitely*, at p. 535.) Statements obtained in violation of the *Miranda* rule are inadmissible to prove guilt in a criminal case. (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1161 (*Aguilera*).)

"An interrogation is custodial when 'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" (*People v. Leonard* (2007) 40 Cal.4th 1370, 1400 (*Leonard*), quoting *Miranda*, *supra*, 384 U.S. at p. 444.) In determining whether a person is in custody for purposes of the *Miranda* rule, the pertinent inquiry is "whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." (*California v. Beheler* (1983) 463 U.S. 1121, 1125 (*Beheler*); accord, *Leonard*, at p. 1400.)

The test for determining whether a person being questioned by the police is in custody for purposes of the *Miranda* rule is an objective test. (*Leonard*, *supra*, 40 Cal.4th at p. 1400.) "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." (*Stansbury v. California* (1994)

22

511 U.S. 318, 323 (*Stansbury*).) Thus, "a police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of *Miranda*." (*Stansbury*, at p. 324.) However, "an officer's views concerning the nature of an interrogation, or beliefs concerning the potential culpability of the individual being questioned, may be one among many factors that bear upon the assessment whether that individual was in custody, but only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave." (*Id*. at p. 325.) "[I]t is the objective surroundings, and not any undisclosed views, that control the *Miranda* custody inquiry." (*Stansbury,* at p. 325.)

Thus, in determining for purposes of the *Miranda* rule whether a defendant was in custody at the time of his or her questioning by the police, the trial court "must first establish the circumstances surrounding the interrogation" (*Aguilera, supra,* 51 Cal.App.4th at p. 1161), and then it must "measure these circumstances against an objective, legal standard: would a reasonable person in the [defendant's] position during the interrogation experience a restraint on his or her freedom of movement to the degree normally associated with a formal arrest." (*Ibid*.)

Courts have identified a number of circumstances that are relevant to the determination of whether the defendant was in custody at the time of his or her questioning by the police. (*Aguilera*, *supra*, 51 Cal.App.4th at p. 1162.) "Among them are whether contact with law enforcement was initiated by the police or the person

23

interrogated, and if by the police, whether the person voluntarily agreed to an interview; whether the express purpose of the interview was to question the person as a witness or a suspect; where the interview took place; whether police informed the person that he or she was under arrest or in custody; whether they informed the person that he or she was free to terminate the interview and leave at any time and/or whether the person's conduct indicated an awareness of such freedom; whether there were restrictions on the person's freedom of movement during the interview; how long the interrogation lasted; how many police officers participated; whether they dominated and controlled the course of the interrogation; whether they manifested a belief that the person was culpable and they had evidence to prove it; whether the police were aggressive, confrontational, and/or accusatory; whether the police used interrogation techniques to pressure the suspect; and whether the person was arrested at the end of the interrogation." (*Ibid*.)

"No one factor is dispositive. Rather, we look at the interplay and combined effect of all the circumstances to determine whether on balance they created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest." (*Aguilera*, *supra*, 51 Cal.App.4th at p. 1162.) "Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest. The weight and pertinence of any communications regarding the officer's degree of suspicion will depend upon the facts and circumstances of the particular case." (*Stansbury, supra*, 511 U.S. at p. 325.)

2. *Standard of review*

"Whether a defendant was in custody for *Miranda* purposes is a mixed question of law and fact." (*Leonard*, *supra*, 40 Cal.4th at p. 1400.) In considering a defendant's claim that his or her statement to the police was inadmissible because it was obtained in violation of the *Miranda* rule, "we accept the trial court's resolution of disputed facts and inferences, and its evaluation of credibility, if supported by substantial evidence." (*People v. Wash* (1993) 6 Cal.4th 215, 235.) "Although we independently determine whether, from the undisputed facts and those properly found by the trial court, the challenged statements were illegally obtained [citation], we '"give great weight to the considered conclusions" of a lower court that has previously reviewed the same evidence.'" (*Id.* at p. 236.)

On appeal we review the legal correctness of the court's ruling, not the court's reasoning. (*People v. Zapien* (1993) 4 Cal.4th 929, 976 (*Zapien*)).

C. *Analysis*

Our task is to determine whether, as Rosas contends, she should have been advised of her *Miranda* rights before she made her self-incriminating statements during her fourth interview, which was conducted on the night of October 17-18, 2011. Of critical importance to our analysis is the undisputed fact that Rosas initiated her contact with law enforcement on October 11, 2011, when she went to the Montclair Police Department and reported that she and her friend Cate had been kidnapped, and that she had no idea what had happened to him. It also undisputed that throughout the first three interviews (on October 12, 13, and 17) she maintained her story that she was a kidnapping victim.

25

The record supports the court's observation that the tone of questioning during the third interview, which was conducted by Detectives Potts and Duran at the Upland Police Station on October 17, became "progressively more aggressive [and] confrontational." However, this circumstance is not dispositive. (See *Stansbury, supra*, 511 U.S. at p. 325 ["Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest."].) Here, the record shows that Rosas willingly accompanied Detective Potts and another officer to the police station for that interview, agreed to talk to the detectives there, and Detective Potts offered her a ride back home when the interview ended. During the third interview, the interview room door was unlocked, and she was not handcuffed.[7]

During that third interview, which lasted more than three hours, Rosas told the detectives the kidnappers made her buy gas for the car with her credit card on the night of her kidnapping.[8] She also told them one of the kidnappers sitting behind her in the car hit her in the neck and told her she was "not going anywhere," one of the kidnappers yelled, "[D]on't let her go," and she was afraid because they told her not to "open her mouth." She told the detectives she knew they were trying to help her.

---

[7] Detective Duran testified that Rosas was free to leave during the third interview, although she was not told this.

[8] As previously noted, Detective Potts testified that although these circumstances were unusual, he still did not consider Rosas a suspect because victims in past investigations had given suspects money or put gas in their cars.

26

Rosas agreed during the interview to accompany the detectives to San Diego to help them find Cate.  She never indicated she wanted to return home.  On the way back from San Diego, she made a phone call to her daughter and let her know she was going to be home late.  Rosas did not go home when they returned to the station that night because the detectives had asked her whether they could ask her some more questions, and she told them she was willing to stay and talk to them.

As previously discussed, the fourth interview at issue here, which was conducted by Detective Duran, began at around 11:30 p.m. that same day (October 17, 2011) after Rosas and the detectives arrived back at the Upland police station and continued into the early morning on October 18.  Nothing in the record suggests Rosas was subjected to any form of coercion or "'restraint on freedom of movement' of the degree associated with a formal arrest" (*Beheler*, *supra*, 463 U.S. at p. 1125) when the interview began.

At around midnight, Rosas made her first self-incriminating statement when she told Detective Duran, "The only thing I want to say is that, like I said my intentions were never to hurt him."  After Rosas made additional self-incriminating statements, Detective Duran again asked her whether she had been kidnapped, stating:  "And the other thing I'd like to know is, you were never kidnapped in the car, you went at your own will."  Rosas responded by again indicating she had been kidnapped.  Specifically, she told Detective Duran, "No just the guy that got the car was the one that told me, don't let that lady go, don't let her go."  She also told the detective that the man told her to give him her purse and then he grabbed it from her and put it on the steering wheel.  Faced with Rosas's inconsistent statements, Detective Duran continued questioning her and said, "Okay you

27

change the story a little bit each time." Shortly thereafter, Rosas told Detective Duran that when the kidnappers started beating Cate, she told them not to hurt him, and one of the men told her to be quiet.

Not long thereafter, at around 12:35 a.m., Detective Potts instructed Detective Duran to advise Rosas of her *Miranda* rights, and Detective Duran did so. Rosas waived her *Miranda* rights and agreed to continue talking with Detective Duran. Rosas admitted that she had talked to Varela about her plan to take Cate to Tijuana, that on the night of the kidnapping Cate did not want to go there, and that she paid Varela $500.

We have already concluded that nothing in the record suggests Rosas was subjected to any form of coercion or "'restraint on freedom of movement' of the degree associated with a formal arrest" (*Beheler*, *supra*, 463 U.S. at p. 1125) when the fourth interview began at around 11:35 p.m. on October 17. Rosas had voluntarily agreed to the interview. Detective Duran was the only officer present during the interview.[9] Nothing in the record suggests Detective Duran placed any restrictions on her freedom of movement after she made her first self-incriminating statement. Although Detective Duran pressed Rosas to tell the truth and confronted her with inconsistencies in her story, he did not use interrogation techniques designed to unduly pressure her.

---

[9]     Detective Potts testified he left Detective Duran alone in the interview room with Rosas during the beginning of the fourth interview because he felt she might feel more "comfortable with somebody Spanish-speaking, of the same heritage, per se." Detective Potts also indicated he was not present when Rosas made the statement about being involved in the kidnapping, and he did not hear her statement.

28

Giving great weight to the considered findings and conclusions of the court to the extent they are supported by substantial evidence, as we must (*Wash*, *supra*, 6 Cal.4th at p. 236), and after reviewing the evidence of the objective circumstances preceding and surrounding Rosas's fourth interview, we conclude the court properly denied her motion to suppress because a reasonable person in her same position during the questioning would not have experienced a restraint on his or her freedom of movement to the degree normally associated with a formal arrest, and, thus, her statements were not obtained in violation of her *Miranda* rights.[10]  (See *Aguilera*, *supra*, 51 Cal.App.4th at p. 1161.)

## II.  *ROSAS'S INSUFFICIENCY-OF-THE-EVIDENCE CLAIM* (*COUNT 3*)

Relying on her own statements to the police that she told Varela and others not to hurt Cate, Rosas also separately contends her count 3 conviction of assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)) must be reversed because there is no evidence she intended to aid and abet the assault upon Cate.  We reject this contention.

---

[10]     In light of our conclusion, we need not address Rosas's claim she suffered prejudice as a result of the court's denial of her motion to suppress the evidence.  Even if we were to assume the court erred in admitting the evidence of Rosas's statements during her fourth interview, we would conclude any such error was harmless under the harmless-beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18, because her convictions are supported by the corroborated accomplice testimony−before both juries−of Oscar, David and Garcia.  We also need not address Rosas's contention that the court erred in applying the "totality of circumstances" test because we review the legal correctness of the court's ruling, not the court's reasoning.  (*Zapien*, *supra*, 4 Cal.4th at p. 976.)

29

A. *Standard of Review*

When assessing a challenge to the sufficiency of the evidence supporting a conviction, we apply the substantial evidence standard of review, under which we view the evidence "in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) "The same standard of review applies to cases in which the prosecution relies mainly on circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

We do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206; *People v. Jones* (1990) 51 Cal.3d 294, 314.) "Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) Thus, "[c]onflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment." (*People v. Maury*, *supra*, 30 Cal.4th at p. 403.)

B. *Analysis*

During her closing argument, the prosecutor acknowledged there was no evidence to show Rosas "in any way touched [Cate]" during the assault that resulted in his death. Rosas was prosecuted on a theory of aiding and abetting the assault upon Cate inside his Buick.

30

"[P]roof of aider and abettor liability requires proof in three distinct areas:  (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime."  (*People v. Perez* (2005) 35 Cal.4th 1219, 1225 (*Perez*).)

Here, Rosas does not challenge the sufficiency of the evidence supporting the direct-perpetrator's-actus-reus requirement.  She concedes that "[s]omeone applied force with sufficient strength to produce great bodily injury."

Rather, in seeking reversal of her count 3 assault conviction, Rosas challenges the sufficiency of the evidence supporting the second requirement:  the aider-and-abettor's-mens-rea requirement.  Specifically, she contends "[t]here was no evidence that she personally intended that force likely to produce great bodily injury be applied [to Cate]."

We reject this contention because the prosecution presented substantial evidence from which any reasonable trier of fact could find beyond a reasonable doubt that Rosas "inten[ded] to assist in achieving [the perpetrators'] unlawful ends" (*Perez*, *supra*, 35 Cal.4th at p. 1225).  By Rosas's own admission after she waived her *Miranda* rights during her fourth interview, the transcript of which was read to her jury, she hired Varela to help her transport Cate to Tijuana against his will and leave him there because she was mad at Cate for taking advantage of her sexually and financially.  Although Rosas repeatedly claimed during the interview that she did not intend for Varela and the others to hurt Cate and that she specifically told Varela and the others not to do so, she admitted

she told Varela they would tie Cates's legs if he tried to run. Garcia testified he heard Varela tell Oscar and Pizana inside Cate's Buick before the assault that "*Rosas wants this guy* [(Cate)] *to get beat up*" and she wanted Varela to take him to Tijuana and drop him off because he did not "have papers to come back."

The prosecution's evidence regarding Rosas's conduct during the assault also supports the jury's finding that she intended that Varela and his cohorts assault Cate. Garcia testified that Pizana opened a back passenger seat door of the Buick and Rosas got out. Pizana then entered the back seat and repeatedly punched Cate in the back. Varela, Tafich, Garcia and David then joined Pizana in punching Cate. Oscar testified that the doors of the Buick were open during the assault and Rosas was "[j]ust standing there" watching what was happening inside the car as it rocked back and forth. Rosas said nothing during the assault and did not try to run away. Her insufficiency-of the-evidence claim is without merit.

### III. *DEFENDANTS' SECTION 654 CLAIMS* (*COUNTS 2 & 3*)

Last, both defendants contend the sentences imposed for their convictions of kidnapping (count 2) and assault by means of force likely to produce great bodily injury (count 3) should be stayed under section 654. For reasons we shall explain, we modify the judgments to stay under section 654 the execution of the sentences imposed for Rosas's and Varela's count 2 kidnapping convictions, but we affirm the sentences imposed for their count 3 convictions of assault by means of force likely to produce great bodily injury.

32

A. *Background*

As pertinent here, over defendants' section 654 objections, the court (1) sentenced Rosas to a determinate nine-year prison term consisting of an eight-year term for her count 2 kidnapping conviction, plus a consecutive one-year term for her count 3 felony assault conviction; and (2) sentenced Varela to a determinate 15-year term consisting of an eight-year term for his count 2 kidnapping conviction, plus a consecutive one-year term for his count 3 felony assault conviction, plus consecutive three-year terms for his count 2 and count 3 great bodily injury enhancements.

B. *Section 654*

Section 654, subdivision (a) provides in part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

Section 654 "precludes multiple punishment for a single act or omission, or an indivisible course of conduct" (*People v. Deloza* (1998) 18 Cal.4th 585, 591) and ensures the defendant's punishment will be commensurate with his or her criminal culpability (*People v. Kramer* (2002) 29 Cal.4th 720, 723). If a defendant suffers two convictions and punishment for one is barred by section 654, "that section requires the sentence for one conviction to be imposed, and the other *imposed and then stayed*." (*Deloza*, at p. 592, italics added.)

Whether a course of conduct is indivisible for purposes of section 654 depends on the intent and objective of the defendant, not the temporal proximity of the offenses.

33

(*People v. Hicks* (1993) 6 Cal.4th 784, 789.)  Generally, if all the criminal acts were incident to one objective, then punishment may be imposed only as to one of the offenses committed.  (*People v. Rodriguez* (2009) 47 Cal.4th 501, 507; *People v. Garcia* (1995) 32 Cal.App.4th 1756, 1781.)

C.  *Analysis*

1.  *Count 2*

Defendants contend the sentences imposed for their count 2 kidnapping convictions should be stayed under section 654 because the prosecution's theory of first degree murder was felony murder based on the predicate felony of kidnapping.

As the People properly concede, felony murder was the sole theory of murder under which this case was prosecuted, and section 654 precludes imposition of separate prison terms for the felony murder and the kidnapping because the kidnapping is the predicate offense for the felony murder.  (See *People v. Montes* (2014) 58 Cal.4th 809, 898.)  Accordingly, the eight-year sentences imposed for defendants' kidnapping convictions must be stayed under section 654.

Varela's three-year count 2 great bodily injury enhancement also must be stayed under section 654.  "Where the base term of a sentence is stayed under section 654, the attendant enhancements must also be stayed."  (*People v. Bracamonte* (2003) 106 Cal.App.4th 704, 709, disapproved on other grounds by *People v. Gonzalez* (2008) 43 Cal.4th 1118, 1130, fn. 8.)  Witkin explains that "[t]he stay of a sentence automatically stays a sentence enhancement imposed with it, because the enhancement cannot be

imposed independent of the underlying sentence."  (3 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Punishment, § 271, p. 429].)

Accordingly, the judgment must be modified to stay under section 654 both the eight-year sentence the court imposed for Rosas's count 2 kidnapping conviction and the 15-year sentence the court imposed for Varela's count 2 kidnapping conviction and his count 2 great bodily injury enhancement.

2.  *Count 3*

Defendants also contend the consecutive one-year sentences imposed for their count 3 convictions of assault by means of force likely to produce great bodily injury should be stayed under section 654 because the violent assault on Cate was an element of his kidnapping (count 2), and, thus, the assault and kidnapping were part of an indivisible course of conduct.

We reject this contention because substantial evidence supports the court's implied findings that in committing the kidnapping and felony assault, defendants acted with separate intents and objectives.  Section 654 "cannot, and should not, be stretched to cover gratuitous violence or other criminal acts far beyond those reasonably necessary to accomplish the original offense."  (*People v. Nguyen* (1988) 204 Cal.App.3d 181, 191.) Here, the brutal, bludgeoning assaults on Cate inside his Buick that resulted in his death (as discussed, *ante*, in the factual background) were acts of gratuitous violence that were "far beyond those reasonably necessary to accomplish the original offense" (*ibid.*) of kidnapping Cate with the objective of taking him to Tijuana and leaving him there.  The evidence of this gratuitous violence supports the court's implied finding that defendants

35

harbored separate intents and objectives in kidnapping and assaulting Cate. Accordingly, we conclude the kidnapping and felony assault were not an indivisible course of conduct for purposes of section 654, and the court did not err in denying defendants' requests to stay under that section the sentences it imposed for their convictions of assault by means of force likely to produce great bodily injury.

## DISPOSITION

The judgments entered against Rosas and Varela are modified to stay under section 654 the execution of the sentences the court imposed for their count 2 kidnapping convictions, including the count 2 great bodily injury enhancement the court imposed on Varela. In all other respects the judgments are affirmed. The matter is remanded to the superior court with directions that the clerk prepare amended abstracts of judgment to reflect the modifications to the judgments and to forward certified copies of the amended abstracts to the Department of Corrections and Rehabilitation.


NARES, Acting P. J.

WE CONCUR:


McDONALD, J.


IRION, J.

36